UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JOHN SIMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cv-00214-JMS-MJD |
| | ) | |
| SCANLON, | ) | |
| MARTS, | ) | |
| SYLVESTER, | ) | |
| TRACE STEVENS, | ) | |
| NATHAN MCKINNEY, | ) | |
| JEFFREY STUPPY, | ) | |
| JOHNWYATT MORELAND, | ) | |
| ALDERSON, | ) | |
| RICHARDSON, | ) | |
| LIKEN, | ) | |
| MILLER, | ) | |
| HAVPTLI, | ) | |
| DAWDY, | ) | |
| RAY, | ) | |
| TARBER, | ) | |
| CHANEY, | ) | |
| FRANK VANIHEL, | ) | |
| FRANK LITTLEJOHN, | ) | |
| J. PORTER, | ) | |
| D. TEMPLETON, | ) | |
| | ) | |
| Defendants. | ) | |

**Order on Defendants' Motion for Summary Judgment**

Plaintiff John Sims contends various officials at Wabash Valley Correctional Facility violated the Eighth Amendment by failing to provide him with drinking water and an alternative housing arrangement during various periods of time when Mr. Sims's cell lacked running water.

Defendants' now move for summary judgment on all of Mr. Sims's claims. For the reasons that follow, their motion, dkt. [125], is **granted in part** and **denied in part**.[1]

### I.
### Standard of Review

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'

---

[1] Mr. Sims has filed a motion requesting a status update of the case. That motion, dkt. [151], is now **granted** consistent with this decision.

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Factual Background

### A.

The Court recites the record in the light most favorable to Mr. Sims. *See Stark v. Johnson & Johnson*, 10 F.4th 823, 825 (7th Cir. 2021). The Court does not vouch for the objective truth of these facts; the Court simply assumes them to be true for purposes of ruling on this motion. *Id.*

The issues in this case stem from plumbing issues in Mr. Sims's cell while he was in segregation at Wabash Valley from December 2020 to March 2021. These issues range from (1) the water being shut off and then not being turned back on; (2) his toilet not flushing properly; (3) his sink not working properly; and (4) Mr. Sims lacking access to clean drinking water. These issues guide the Court's recitation of the facts, keeping in mind, however, that conditions of confinement claims—like the ones proceeding here—turn on the totality of the situation and not on isolated events. *See Smith v. Fairman*, 690 F.2d 122, 125 (7th Cir. 1982).

A couple of housekeeping notes before moving on. First, the record reflects that some of the defendants' names are often misspelled in the record. For example, one of the named Defendants is Officer "Liken"; however, in Mr. Sims's deposition, he is identified as Defendant "Luken". Dkt. 126-1, Deposition of John Sims at 18. The same is true of other Defendants. *See e.g. id.* at 60 (spelling Officer "Havptli" as "Hauptli"). None of these misspellings are material to the outcome, and for ease of the reader, the Court refers to Defendants as they are identified in the caption of this lawsuit.

Second, Defendants have moved for summary judgment relying primarily on Mr. Sims's deposition testimony. *See* Dkt. 127, Defendants' Brief. While there is nothing improper with that approach, the Court notes that there are some areas in the record that are incomplete or are unclear. In those areas, Mr. Sims is given the benefit of the doubt consistent with the standard at summary judgment. *Stark*, 10 F.4th at 825; *see also Marcure v. Lynn*, 992 F.3d 625, 631 (7th Cir. 2021) (explaining a moving party under Rule 56 "must prove their entitlement to relief"). With those two caveats, the Court turns to the record at hand.

## B.

Mr. Sims's water issues began in December 2020. Dkt. 126-1 at 10 – 11. During that time, he was confined to the Custody Control Unit (CCU), which is a segregation unit at Wabash Valley. *Id.* At some point in December, a water main broke in the city of Carlisle, Indiana, where Wabash Valley is located. *Id.* at 14. The water in Mr. Sims's cell was subsequently shut off. *Id.* The water remained off for a total of ten consecutive days. *Id.* at 20.[2]

During those ten days, Mr. Sims lacked running water to his cell. *Id.* at 16. The only time he had something to drink was at breakfast when he received coffee and juice. *Id.* Mr. Sims asked Defendants Marts, Scanlon, McKinney, Liken, Miller, Sylvester, and Stevens to bring him drinking water. *Id.* at 17. They told Mr. Sims they were busy, and they would bring him water later. *Id.* at 18. However, none of them ever did. *Id.* Officer McKinney, for his part, expressly refused to provide Mr. Sims with water. *Id.* Mr. Sims also did not have access to drinking water

---

[2] The record is not clear whether the water was turned off due to the water main issue in the city of Carlisle, or if it was due to Mr. Sims's individual toilet being broken. Mr. Sims testified that Wabash Valley officials (in response to the water main break) stated "the water was going to be down", *id.* at 14, but he also testified at the end of the ten-day period "a maintenance inmate" was able to fix the problem, *id.* at 20. Whatever the case, his testimony provides evidence that his cell was without water for ten consecutive days.

during recreation time. *Id.* at 61. As a result of his limited fluid intake, Mr. Sims was often dizzy and dehydrated. *Id.* at 66.[3]

During those ten days, Mr. Sims also was not able to flush his toilet which led to a buildup of his urine and feces. *Id.* at 35 – 36. Mr. Sims was not given an opportunity to use a restroom with a functioning toilet. *Id.* at 27. On the tenth day, a maintenance inmate fixed Mr. Sims's toilet, and the water was turned back on. *Id.* at 20.

Although Mr. Sims's toilet appeared to be fixed in December 2020, Mr. Sims's water issues continued into 2021. *Id.* at 21. One of these issues was a "sandy substance" contained in his drinking water. *Id.* at 75 – 76. This issue began in December 2020 and lasted throughout Mr. Sims's entire time in segregation. *Id.* The potency of the sandy substance varied: some days it was bad, other days it was not. *Id.* at 76. On the days it was bad, Mr. Sims would vomit after he tried drinking it. *Id.* at 35. Other times, he was able "to hold it down." *Id.* Mr. Sims contacted both Warden Frank Vanihel and Assistant Warden Frank Littlejohn about the sandy substance. Dkt. 126-3, Vanihel Interrogatories at 3; Dkt. 126-4, Request for Interview. Warden Vanihel recalls receiving a request in February 2021 about "funny tasting water". Dkt. 126-3, Vanihel Interrogatories at 3. In response, he notified the maintenance staff of the ongoing issues. *Id.* He does not recall receiving other requests. *Id.* at 2 – 4. Warden Littlejohn contacted officials with the city, advised them of the problem, but was told that the water was safe to drink. Dkt. 126-4.

The other issue was Mr. Sims's toilet malfunctioning or not working altogether. Sometimes the toilet would consistently flush over and over and could not be stopped. Dkt. 126-1 at 26 – 27. Other times, it would not flush at all. *Id.*; *see also* Dkt. 142-1 at 43 – 60 (Work Orders). Mr. Sims

---

[3] In his complaint and deposition, Mr. Sims alleges that IDOC has a policy that requires staff to provide drinking water to inmates every two-to-four hours in the event of the water outage. Dkt. 1, Complaint ¶ 38; Dkt. 126-1 at 30 – 31. Defendants have not denied that such policy exists. However, neither party has submitted the policy for the Court's review.

told Officers Marts, Alderson, Richardson, Sylvester, Scanlon, Stevens, Liken, and Miller about his toilet not flushing. Dkt. 126-1 at 29 – 30. They all responded that they would speak with Lt. Stuppy, but "nothing ever happened." *Id.*

Inmate maintenance workers or staff maintenance workers attempted to fix the water in Mr. Sims's cell at least ten times from January to March 2021. Dkt. 126-1 at 42; Dkt. 142-1 at 43 – 60. One of these staff workers was Defendant Templeton. Dkt. 126-1 at 37. He attempted to repair Mr. Sims's toilet on several occasions but was unsuccessful. *Id.* at 65. Eventually, Mr. Templeton refused to further work on the toilet until a replacement part arrived at the facility. *Id.* Once the part arrived, Mr. Templeton successfully fixed the toilet. *Id.*

When there were issues with Mr. Sims's toilet, the water to his cell would be shut off. *Id.* at 21, 27. The exact amount of times this occurred is not clear from the record. Mr. Sims testified that there was a period of time in January 2021 where his cell was without water for 48 – 72 hours. *Id.* at 21 – 22. He also testified the same thing happened the following month. *Id.* In his declaration, he states that his water was turned off more than eight times. Dkt. 142-1 at 40. Exact numbers aside, both parties agree that from January to March 2021, the water was turned off to Mr. Sims's cell intermittently due to issues with his toilet.

During these periods of time, Mr. Sims asked Defendants Scanlon, Marts, Sylvester, Stevens, McKinney, Moreland, Alderson, Richardson, Liken, Miller, Havptli, Dawdy, Ray, Tarber, and Chaney to bring him drinking water. Dkt. 126-1 at 22. Some of the officers said they would bring him drinking water, but they never returned. *Id.* Defendants Sylvester, Scanlon, McKinney, and Chaney refused to bring Mr. Sims water because of "issues" they had with Mr. Sims.[4] *Id.* at 23.

---

[4] Mr. Sims testified in his deposition that he had previously "gunned down" these officers' staff members. "Gunning down" means to throw body fluids on to someone.

During these periods of time, Mr. Sims requested to be moved to a different cell. *Id.* at 27. He wrote requests to Ms. Porter (a case manager), Lt. Stuppy, Warden Vanihel, Warden Littlejohn, and Officer McKinney. *Id.* Ms. Porter refused to move him. *Id.* at 66. She stated the segregation unit was at full capacity, and there were no available cells for Mr. Sims to be transferred. Dkt. 126-2, Porter Interrogatories at ¶ 7. Lt. Stuppy states that he attempted to move Mr. Sims, but Mr. Sims refused. *See* Dkt. 126-1 at 53. Mr. Sims disputes this. *Id.* There is no evidence that Warden Vanihel, Warden Littlejohn, or Officer McKinney responded to Mr. Sims's requests to be moved.

After Defendant Templeton fixed Mr. Sims's toilet in March 2021, Mr. Sims did not have any further issues. *Id.*at 75. The "sandy substance" in his water persisted, but Mr. Sims stopped asking about it because he felt it was "pointless." *Id.* Mr. Sims remained in segregation at Wabash Valley until February 2022 when he was transferred to Westville Correctional Facility. *Id.*

Mr. Sims brought this lawsuit on May 10, 2021. Dkt. 1. Mr. Sims then filed an amended complaint, and the Court identified Eighth Amendment conditions-of-confinement claims to proceed against the named Defendants. Dkt. 9; *see also* Dkt. 18, Screening Order at 4 – 5.[5] Discovery was completed. Defendants now move for summary judgment. Dkt. 125, Defendants' Motion for Summary Judgment.

---

[5] Mr. Sims also brought claims against several nurses for allegedly failing to provide medical attention to a rash he developed while using his toilet. Dkt. 9 ¶¶ 23, 24. He alleged they would not schedule him for medical care because he was positive for COVID-19. *Id.* The Court explained that these claims were misjoined and directed Mr. Sims to either request that they be severed into a separate lawsuit or else they would be dismissed without prejudice. Dkt. 18 at 4. Mr. Sims filed a response to the screening order in which he asked the Court to change certain Defendants' names; he did not request that the claims against the nurses be severed. Dkt. 22. These claims were therefore subsequently dismissed without prejudice. *See* Dkt. 39, Order Regarding Service and Dismissing Defendants.

## III.
### Discussion

Defendants argue summary judgment is appropriate for a number of reasons. First, they contend that none of the conditions in Mr. Sims's cell posed an objectively serious risk of harm. Second, they argue that they were not deliberately indifferent to Mr. Sims's cell conditions. Finally, Warden Vanihel argues that he lacks sufficient personal involvement to be held liable under 42 U.S.C. § 1983. Mr. Sims responds that there are questions of material fact as to each Defendant. The Court begins with the legal standard and then turns to Mr. Sims's claims.[6]

### A.

The Eighth Amendment forbids "cruel and unusual punishment." U.S. Const. amend. VIII. "By prohibiting cruel and unusual punishment, the Eighth Amendment imposes duties on prison officials to 'provide humane conditions of confinement' and 'ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). "An official who fails to uphold these

---

[6] Defendants first argue that Mr. Sims has failed to comply with the Local Rules. Dkt. 127 at 2. They assert that his response does not contain a statement of material facts in dispute section, *see* S.D. Ind. L.R. 56-1(b), and does not contain citations to the relevant evidence, *see* S.D. Ind. L.R. 56-1(e). To that end, Defendants contend "Plaintiff's failure to abide by the local rules is sufficient grounds for awarding Defendants summary judgment." Dkt. 127 at 3.

First, whether to strictly enforce local rules is a matter of discretion. *See McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 787 n.2 (7th Cir. 2019). Here, Mr. Sims is proceeding *pro se*; he has a seventh-grade education, Dkt. 92 at 2; he in good-faith attempted to comply with the Rules by filing a response and brief-in-support—which contains a section titled "Statement of Facts Not in Dispute", Dkt. 143 at 4. The Court declines to strictly enforce the Local Rules in these circumstances. Second, even if the Court did so, that does not automatically mean Defendants are entitled to summary judgment. A party's failure to include a section containing the statement of material facts in dispute only means the facts alleged in the moving party's motion are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f). It still remains Defendants' burden to show that summary judgment is appropriate. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up)

duties violates the Eighth Amendment upon exhibiting 'deliberate indifference to a substantial risk of serious harm to an inmate.'" *Thomas*, 2 F.4th at 719 (quoting *Farmer*, 511 U.S. at 719).

To present his conditions-of-confinement claims to a jury, Mr. Sims must first show that the conditions of his cell were sufficiently serious as an objective matter, meaning that they denied him "the minimal civilized measure of life's necessities, creating an excessive risk to [his] health and safety." *Thomas*, 2 F.4th at 719. Second, Mr. Sims must show that Defendants "acted with deliberate indifference—that they knew of and disregarded [the] excessive risk of harm to [him]."). *Quinn v. Wexford Health Sources, Inc*, 8 F.4th 557, 565 (7th Cir. 2021). Conditions of confinement claims turn on the totality of the conditions in the aggregate, not on each isolated condition. *See Smith*, 690 F.2d at125 (explaining the Circuit takes a "totality of the conditions of confinement" approach to cruel and unusual punishment issues); *accord Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013).

Water and sanitation in the correctional setting are essential. *Hardeman v. Curran*, 933 F.3d 816, 818 – 19 (7th Cir. 2019) ("Water is vital for both health and sanitation. . . Basic sanitation is also essential."); *Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989) ("This court has repeatedly stressed that the Eighth Amendment requires prison officials to maintain minimal sanitary and safe prison conditions[.]"). So much so that the Seventh Circuit has held "the right to water for drinking and personal sanitation, and the right to live in an environment free of accumulated human waste is clearly established." *Hardeman*, 933 F.3d at 823.

**B.**

The Court first considers whether Mr. Sims has put forward sufficient evidence to satisfy the objective element. Taking the conditions he complains of—as a whole—the Court concludes

Mr. Sims has put forward sufficient evidence from which a jury could conclude the conditions he experienced were objectively serious.

His testimony reflects that between December 2020 and March 2021, his toilet was consistently breaking down, which resulted in the water supply to his cell being shut off. This includes a ten-day period in December 2020, several 48-to-72 hour periods in January and February 2021, and several other shorter periods of time. *See* Dkt. 142-1 at 40 ¶ 11 (Mr. Sims noting his water was shut of more than eight times between February and May 2021). During these times, Mr. Sims states that he was limited to a cup of coffee and juice at breakfast, that the "sandy substance rendered the drinking water unconsumable at times so much so that it caused Mr. Sims to vomit, and that correctional officers refused to provide him more drinking water. *See Canupp v. Paul*, 716 F. App'x 836, 840 (11th Cir. 2017) ("There can be no doubt that adequate hydration is among the basic life necessities that prisoners are guaranteed under the Eighth Amendment.") (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993)).

During these same times,  Mr. Sims's toilet did not flush, and so he was forced to urinate and defecate in a toilet that contained human waste. Additionally, because he was in segregation, he was forced to live around such waste for extended periods of times. *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) ("Exposure to human waste, like few other conditions of confinement, evokes both the health concerns emphasized in *Farmer* and the more general standards of dignity embodied in the Eighth Amendment."); *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d. Cir. 1972) ("Causing a man to live, eat, and perhaps sleep in close confines with his own human waste is too debasing and degrading to be permitted.").

Based on this record, a jury would be well within its rights to conclude that the conditions complained of denied Mr. Sims the minimal civilized measure of life's necessities. *See e.g.*

*Johnson*, 891 F.2d at 139 – 40 (reversing grant of summary judgment and holding that placement of a prisoner in a feces-smeared cell for three days without running water and cleaning supplies could violate the Eighth Amendment).

Defendants argue that the conditions in Mr. Sims's cell were not sufficiently serious. In doing so, they isolate each condition and argue that no single condition jeopardized Mr. Sims's health and safety. *See* Dkt. 127 at 11 – 13. But Mr. Sims's claims turn not on whether each condition in isolation denied him the minimal civilized measure of life's necessities but rather whether the conditions in the aggregate denied him such necessities. *Smith*, 690 F.2d at 125; *Budd*, 711 F.3d at 843. After all, Mr. Sims did not experience each of these conditions in isolation; he experienced them together over prolonged periods of time. While certain incidents or periods of time might not have—alone—violated the constitution, they present a triable issue when considered as a whole. The Court therefore rejects Defendants' position to the contrary.

Defendants also argue *Tesch v. County of Green Lake*, 157 F.3d 465 (7th Cir. 1998), controls the outcome here. In *Tesch*, an inmate with muscular dystrophy could not access his sink for drinking water for a period of two days and had to request assistance with putting on his clothes and getting into bed. *Id.* at 476. The Seventh Circuit held that the nature and duration of these conditions were not sufficiently severe to rise to the level of a constitutional violation. *Id.* But *Tesch* is easily distinguishable as Mr. Sims's conditions were more severe both in nature and duration. He received beverages only at breakfast, he was denied drinking water throughout the day, and the periods of time he had to experience these deprivations spanned the course of months rather than days. *Tesch*, therefore, does not change the outcome here.

Accordingly, the Court finds Mr. Sims has proffered enough evidence to satisfy the first element of his claim.

## C.

Having concluded that a jury could find Mr. Sims's cell conditions were sufficiently serious, the Court now considers whether there is sufficient evidence to support a finding of deliberate indifference for each Defendant. The Court will group the Defendants as follows: (1) Correctional Officers (Scanlon, Marts, Sylvester, Stevens, McKinney, Moreland, Alderson, Richardson, Liken, Miller, Havptli, Dawdy, Ray, Tarber, Chaney); (2) Wardens (Vanihel and Littlejohn); (3) Defendants with Authority to Transfer Mr. Sims (Lt. Stuppy and Case Worker Ms. Porter); and (4) Maintenance Worker (Mr. Templeton). Each group is discussed, in turn, below.

### 1.      Correctional Officers

A jury could find the Correctional Officer Defendants were deliberately indifferent to the serious risks posed by Mr. Sims's cell conditions.

Mr. Sims's testimony reflects that in December 2020, he asked Defendants Marts, Scanlon, McKinney, Liken, Miller, Sylvester, and Stevens to bring him drinking water. They told Mr. Sims they would bring him water, but they never did. Dkt. 126-1 at 17 – 18. In January and February 2021, Mr. Sims asked Defendants Scanlon, Marts, Sylvester, Stevens, McKinney, Moreland, Alderson, Richardson, Liken, Miller, Havptli, Dawdy, Ray, Tarber, and Chaney to bring him drinking water. They acknowledged his request, but they never brought him water. *Id.* at 22. Mr. Sims submitted an affidavit attesting that all of these Defendants "refused" to bring him water on more than one occasion, dkt. 142-1 at 39 ¶ 5, and Defendants have not submitted any affidavits presenting an alternative account. Given this record, a jury could conclude that the Correctional Officer Defendants were deliberately indifferent to Mr. Sims's requests for drinking water. Summary judgment for the Correctional Officer Defendants is therefore **denied**.

Likewise, a jury could conclude Officers Marts, Alderson, Richardson, Sylvester, Scanlon, Stevens, Liken, and Miller were deliberately indifferent to Mr. Sims's concerns about his toilet not flushing. Mr. Sims informed all of these officers that his toilet would not flush, and in response, "nothing ever happened". Dkt. 126-1 at 29 – 30. There is no evidence in the record that these officers took any steps to fix the issue or investigate the problem. Accordingly, a jury could find these defendants liable on this basis too. *LaReau*, 473 F.2d at 978.

Some of these Defendants (Sylvester, Stevens, Moreland, Alderson, Richardson, Liken, Miller, Havptli, Dawdy, Ray, and Tarber) contend they lacked the requisite knowledge to be held liable. Dkt. 127 at 14. In essence, they contend Mr. Sims's deposition testimony—at most—implies that these defendants forgot to provide him with water, and there is no evidence they had knowledge of any serious risk of harm. *See Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 (7th Cir. 2021) (deliberate indifference entails more than just negligence).

But, based on the record evidence, the Court concludes the motive of each officer is best left to a jury. First, deliberate indifference can be found where a prisoner's request falls on "deaf ears." *See Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015) ("[P]risoner requests for relief that fall on "deaf ears" may evidence deliberate indifference."). A jury could find that was the case here. Second, the record and the testimony must be construed in Mr. Sims's favor. While Defendants' interpretation of Mr. Sims's testimony is reasonable, a jury could alternatively conclude that Defendants' responses to his requests for water were nothing more than empty promises and that they deliberately brushed him aside. Summary judgment is not the time to decide who's telling the truth. *Outlaw v. Newkirk*, 259 F.3d 833, 836 – 37 (7th Cir. 2001) ("In ruling on a motion for summary judgment, the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of

triable fact. All doubts should be resolved in the nonmoving party's favor."). Finally, Mr. Sims states in his affidavit that all of the Defendants "refused" to provide him with water. That is evidence that the Court must consider. *See Ingram v. Watson*, 67 F.4th 866, 870 – 71 (7th Cir. 2023) (reversing grant of summary judgment based on inmate's statements in an affidavit); *id.* ("A district court must accept evidence [in an affidavit] when ruling on a motion for summary judgment and must consider the record in the light most favorable to the party opposing the motion . . . the court also cannot disbelieve statements in affidavits without a holding a hearing.").

Accordingly, the Court finds that there is a genuine factual dispute over each officer's intent when denying Mr. Sims water. Summary judgment for the Correctional Officer Defendants is therefore **denied**.[7]

## 2. Warden Vanihel and Warden Littlejohn

The record requires a split outcome for the Wardens: no rational jury could find that Warden Littlejohn was deliberately indifferent; however, a rational jury could find that Warden Vanihel was.

The conditions in Mr. Sims's cell were objectively serious and they spanned for months. This was not a one-off issue. Additionally, the water issues may have stemmed (at least in part) from a water main break in the city, which certainly would have signaled to the Wardens the need to ensure proper hydration and sanitation. Mr. Sims attested that he wrote both Wardens about the issues in his cell. Dkt. 126-1 at 67 – 69. He told them about the issues he was having with his toilet, explained to them about the issues regarding the "sandy substance" in his drinking water; informed them that the staff members were not providing him adequate water, and he requested that he be

---

[7] The record also reflects that Defendants Sylvester, Scanlon, McKinney, and Chaney intentionally refused to bring Mr. Sims water because he had "gunned down" their staff in the past. Dkt. 126-1 at 23. This is an additional reason to deny summary judgment as to these Defendants.

moved to a different cell. *Id.* Despite these requests, he was never moved to a different cell, nor was he given adequate drinking water.

The reason for the difference in outcomes turns on each Warden's response to Mr. Sims's complaints. Warden Littlejohn responded by making further inquiries into the circumstances and communicating information back to Mr. Sims. Dkt. 126-4. For example, he contacted the water plant in Carlisle and was advised that when the temperature gets below a certain degree, it causes the water to be cloudy. *Id.* He wrote back to Mr. Sims explaining that the water was safe to drink. *Id.* Even if that did not completely solve Mr. Sims's problem—as Mr. Sims has testified that the "sandy substance" still made him sick—it is evidence that Warden Littlejohn took some action. On the other hand, Warden Vanihel did not respond to Mr. Sims at all. He stated in his interrogatory responses that he contacted the appropriate facility and maintenance staff, dkt. 126-3, but it is not entirely clear who he contacted or what he said. Beyond that, there is no evidence he took any further action to investigate Mr. Sims's cell conditions or to address the issue of the correctional officers denying Mr. Sims's water.

Although Wardens generally are permitted to delegate tasks to their subordinates and are not responsible for ensuring those tasks are carried out correctly, they cannot turn a blind eye to conditions that create a serious risk of harm. *Compare Haywood v. Hathaway*, 842 F.3d 1026, 1033 (7th Cir. 2016) (reversing grant of summary judgment against Warden who was on notice that inmate's segregation cell conditions were subject to extreme weather but nonetheless failed to take meaningful action), *with Estate of Miller by Chassie v. Marberry*, 847 F.3d 425, 429 (7th Cir. 2017) (affirming grant of summary judgment against Warden who failed to look into whether inmate had a lower bunk pass before an inmate fell and injured himself). This is particularly so where, as here, the inmate complains that the subordinate employees are contributing to the risk

(by denying him drinking water). Simply put, when presented with information that an inmate faces a serious risk of harm and the subordinate staff are contributing to that risk, a warden cannot turn a blind eye. Warden Littlejohn designated evidence that he took some action to address Mr. Sim's conditions; Warden Vanihel did not.

Warden Vanihel argues he was not personally involved in addressing Mr. Sims's cell conditions. *See Johnson v. Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019); *see also* Dkt. 127 at 9 ("[T]here is no evidence that Defendant Vanihel ever received those requests, was aware of these complaints, or directly participated in the response process with respect to these complaints."). However, Mr. Sims testified in his deposition that he wrote Warden Vanihel explaining the issues to him, and Warden Vanihel admitted to receiving at least one of Mr. Sims's requests. Dkt. 126-3 ¶ 4. That is enough to create a factual question on whether Warden Vanihel was aware of Mr. Sims's cell conditions. *See Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018) (reversing grant of summary judgment and finding a question of fact as to whether warden was aware of an impending inmate attack after the inmate wrote the warden a note requesting protection).

Warden Littlejohn is therefore entitled to summary judgment. A jury must resolve the claim against Warden Vanihel.

### 3.    Staff with Authority to Transfer Mr. Sims

A jury could likewise conclude that Lt. Stuppy and Ms. Porter were deliberately indifferent to Mr. Sims's cell conditions.

Ms. Porter was Mr. Sims's case worker. Dkt. 126-1 at 66 – 67. Mr. Sims testified that Ms. Porter knew that his cell lacked running water, knew that his toilet was not working, knew that the correctional officers were not providing him drinking water, and yet still refused to move him to another cell. *Id.* at 66. Lt. Stuppy also refused to move Mr. Sims despite knowledge of all

his cell conditions. *Id.* at 47. These Defendants both seemingly had the authority to transfer Mr. Sims. Based on the totality of the conditions Mr. Sims experienced, and the authority these two defendants had in deciding whether to move Mr. Sims, a jury could rationally conclude these defendants were deliberately indifferent to the serious risk of harm posed by Mr. Sims's cell conditions.

Lt. Stuppy argues that he attempted to move Mr. Sims,[8] but that Mr. Sims objected to being moved. *Id.* at 53 (explaining Lt. Stuppy stated Mr. Sims objected when he tried to move Mr. Sims to a different cell). However, Mr. Sims vehemently disagrees with that statement. *Id.* ("Yes. I disagree because I never told him that I didn't want to get moved to a different cell."). That is a factual question a jury must resolve.

Ms. Porter argues that she could not transfer Mr. Sims because the CCU unit was at max capacity, so there were no open cells. Dkt. 126-2 ¶ 7. But the fact that Lt. Stuppy asserts that he attempted to transfer Mr. Sims casts doubt on whether the CCU was actually at capacity. This evidence at least calls into question Ms. Porter's stated reason for not transferring Mr. Sims, and so, it too, is best left in the hands of a jury.

Summary judgment against these defendants is therefore **denied**.

### 4.      Maintenance Worker Templeton

Finally, with respect to Defendant Templeton, no rational jury could find that he was deliberately indifferent to Mr. Sims's broken toilet.

The record reflects that Defendant Templeton attempted to repair (albeit unsuccessfully) Mr. Sims's toilet on several occasions. He refused to work further on the toilet until a replacement part arrived at the facility. Once the part arrived, Mr. Templeton fixed the toilet, and Mr. Simms

---

[8] Lt. Stuppy did not submit an affidavit. This piece of evidence comes from Mr. Sims's deposition.

experienced no further issues with it. This is not a record that supports a finding of deliberate indifference.

Mr. Sims faults Defendant Templeton for refusing to work on the toilet while waiting for the replacement part. But there is no evidence that it could have been fixed without the replacement part, or that Defendant Templeton was insincere in waiting for the replacement part. Mr. Sims also contends Defendant Templeton did not ask Lt. Stuppy to move Mr. Sims to a different cell. But the record reflects that Lt. Stuppy was aware of the issues and made the decision not move Mr. Sims. The fault (if any) therefore lies with Lt. Stuppy, not Defendant Templeton. In short, Defendant Templeton attempted to resolve Mr. Sims's broken toilet; he did not ignore it or turn a blind eye to it. Summary judgment is therefore appropriate.

## IV.
## Conclusion

For those reasons, Defendants' motion for summary judgment, dkt. [125], is **granted in part** and **denied in part**.

The motion is **granted** with respect to Defendants D. Templeton and Warden Frank Littlejohn. The **clerk is directed** to **terminate** these Defendants from the docket.

The motion is **denied** with respect to Defendants Scanlon, Marts, Sylvester, Stevens, McKinney, Moreland, Alderson, Richardson, Liken, Miller, Havptli, Dawdy, Ray, Tarber, Chaney, Vanihel, Stuppy, and Porter.

Mr. Sims's motion for status update, dkt. [151], is **granted** consistent with the rulings in this Order.

The following chart provides the claims that survive summary judgment for each of the (18) remaining Defendants:

| Defendant | Surviving Claim |
|---|---|
| **Correctional Officers** | |
| Scanlon | Refusing to provide Mr. Sims with clean drinking water in December 2020 and between January and March 2021. Also, refusing to provide Mr. Sims with clean drinking water because Sims had "gunned down" staff members in the past. Refusing to investigate or address Mr. Sims's toilet not flushing properly. |
| Marts | Refusing to provide Mr. Sims with clean drinking water in December 2020 and between January and March 2021. Refusing to investigate or address Mr. Sims's toilet not flushing properly. |
| Sylvester | Refusing to provide Mr. Sims with clean drinking water in December 2020 and between January and March 2021. Also, refusing to provide Mr. Sims with clean drinking water because Sims had "gunned down" staff members in the past. Refusing to investigate or address Mr. Sims's toilet not flushing properly. |
| Stevens | Refusing to provide Mr. Sims with clean drinking water in December 2020 and between January and March 2021. Refusing to investigate or address Mr. Sims's toilet not flushing properly. |
| McKinney | Refusing to provide Mr. Sims with clean drinking water in December 2020 and between January and March 2021. Also, refusing to provide Mr. Sims with clean drinking water because Sims had "gunned down" staff members in the past and because it was purportedly not his job to bring drinking water to inmates. |
| Moreland | Refusing to provide Mr. Sims with clean drinking water between January and March 2021 |
| Alderson | Refusing to provide Mr. Sims with clean drinking water between January and March 2021. Refusing to investigate or address Mr. Sims's toilet not flushing properly |
| Richardson | Refusing to provide Mr. Sims with clean drinking water between January and March 2021. Refusing to investigate or address Mr. Sims's toilet not flushing properly. |
| Liken | Refusing to provide Mr. Sims with clean drinking water in December 2020 and between January and March 2021. Refusing to investigate or address Mr. Sims's toilet not flushing properly. |
| Miller | Refusing to provide Mr. Sims with clean drinking water in December 2020 and between January and March 2021. Refusing to investigate or address Mr. Sims's toilet not flushing properly. |
| Havptli | Refusing to provide Mr. Sims with clean drinking water between January and March 2021 |
| Dawdy | Refusing to provide Mr. Sims with clean drinking water between January and March 2021 |
| Ray | Refusing to provide Mr. Sims with clean drinking water between January and March 2021 |

| | |
|---|---|
| Tarber | Refusing to provide Mr. Sims with clean drinking water between January and March 2021 |
| Chaney | Refusing to provide Mr. Sims with clean drinking water between January and March 2021. Also, refusing to provide Mr. Sims with clean drinking water because Sims had "gunned down" staff members in the past. |
| **Warden** | |
| Vanihel | Declining to address the conditions posed by Mr. Sims's cell and ignoring Mr. Sims's request to be transferred to a different cell. |
| **Staff With Authority to Transfer** | |
| Stuppy | Declining to address the conditions posed by Mr. Sims's cell and ignoring Mr. Sims's request to be transferred to a different cell. |
| Porter | Declining to address the conditions posed by Mr. Sims's cell and ignoring Mr. Sims's request to be transferred to a different cell. |

Mr. Sims's Eighth Amendment claims against these (18) remaining Defendants shall be resolved either through settlement or trial. Within **21 days of this Order**, Defendants' counsel shall file a supplement with the Court listing the first and last names of each of these Defendants with accurate spellings.

Upon reconsideration, Mr. Sims's motion to appoint counsel, dkt. [92], is **granted**. The Court will attempt to recruit counsel for Mr. Sims for the remainder of this case.

The Court, however, prefers that Mr. Sims use the Court's form for requesting counsel. The **clerk is directed** to send Mr. Sims the Court's form motion for assistance recruiting counsel with his copy of this Order. Mr. Sims has **through July 14, 2023**, to complete this form and return it to the Court.

  **SO ORDERED.**

Date: 6/15/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

JOHN SIMS
232623
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

All Electronically Registered Counsel